PICTORIAL REVIEW COMPANY, Plaintiff, *v.* THE STATE OF NEW YORK, Defendant.

Claim No. 23284.

Court of Claims, August 17, 1933.

*Burroughs & Brown [M. C. Fuldner* of counsel], for the claimant.

*John J. Bennett, Jr., Attorney-General [Harold P. Burke, Second Assistant Attorney-General,* of counsel], for the State of New York.

RYAN, J. This claim is based on section 280 of the Tax Law and is submitted upon an agreed statement of facts. The claimant has duly complied with the requirements of the statute in respect to presenting its claim to the State Tax Commission and in respect to filing the same after its rejection by the Tax Commission.

On November 19, 1931, the Pictorial Review Company, claimant, was controlled by William P. Ahnelt who was its principal stock

holder. The company and its subsidiaries were indebted in a large sum to the West Virginia Pulp and Paper Company and to the W. F. Hall Printing Company. Ahnelt deposited with the Irving Trust Company, certificates for 155,960 shares of the Pictorial Review Company and for 19,250 shares of the Excella Pattern Company, a subsidiary. All certificates were properly indorsed in blank. On October 4, 1932, the Irving Trust Company redelivered the shares in question to the original depositors.

Claimant seeks to recover the sum of $6,276.92 paid by it on September 15, 1932, to the Irving Trust Company for stock transfer stamps taxing the transfer of the shares in question in and out of the trust company, together with interest on the amount from the date on which the Tax Commission rejected its claim.

The deposit was made pursuant to the terms of a written agreement wherein the claimant company was the party of the first part; Ahnelt was party of the second part; the West Virginia Pulp and Paper Company and the W. F. Hall Printing Company were parties of the third part; and Irving Trust Company was party of the fourth part. A copy of the agreement which is lengthy and detailed was attached to and made a part of the agreed statement of facts.

The contention of claimant is that each transfer was exempted from the tax imposed by section 270 of the Tax Law by virtue of the third sentence thereof which upon the date of the deposit agreement, read as follows: " * * * It is not intended by this article to impose a tax upon an agreement evidencing the deposit of certificates as collateral security for money loaned thereon, which certificates are not actually sold, nor upon such certificates so deposited, nor upon transfers of such certificates to the lender or to a nominee of the lender or from one nominee of the lender to another, provided the same continue to be held by such lender or nominee or nominees as collateral security as aforesaid, nor upon the retransfer of such certificates to the borrower. * * * "

Section 270 of the Tax Law has been several times amended and several times construed by the courts. There can be no question that the transaction herein fell within the taxing clause or the first sentence of section 270. (*U. S. Radiator Corporation* v. *State of New York*, 208 N. Y. 144; *Bonbright & Co.* v. *State of New York*, 165 App. Div. 640; *Travis* v. *Ann Arbor Co.*, 180 id. 799; affd., 227 N. Y. 640.)

The only question is: Was the agreement one " evidencing the deposit of certificates as collateral security for money loaned thereon, which certificates are not actually sold," and, therefore, was the transaction exempt from tax?

It will be necessary to quote at length from the agreement, the preamble of which after reciting the indebtedness of the claimant, reads: " * * * and the party of the first part is desirous of obtaining an extension of the payment of said indebtedness, of obtaining additional credit from said creditors, and of securing to said creditors the ultimate payment of said present indebtedness and any subsequent indebtedness to them or their respective subsidiaries incurred by the party of the first part or its subsidiaries during the term of this agreement, and

" *Whereas* the party of the second part is the President of The Pictorial Review Company, party of the first part, and is the owner and holder of 155,960 shares of the capital stock of said The Pictorial Review Company out of a total of 234,427 shares now issued and outstanding, and is desirous of protecting his interest in said Company by having it obtain additional credit from the parties of the third part, and of securing to said creditors the ultimate payment of the aforesaid present indebtedness and any subsequent indebtedness to them or their respective subsidiaries incurred by the party of the first part or its subsidiaries during the term of this agreement, and

" *Whereas* the parties of the third part are willing to extend the time of payment of the present indebtedness owing by the party of the first part and its subsidiaries, upon the conditions hereinafter stated, and the West Virginia Pulp and Paper Company is willing to supply the party of the first part with additional paper and to that end has entered into a renewal contract * * * and the W. F. Hall Printing Company is willing to supply the party of the first part with additional printing, upon such terms of credit as may be agreed upon from time to time by them respectively with the party of the first part."

Upon this premise, the third parties agreed to extend the time of payment of the indebtedness due them and to continue to deal with claimant and to provide it with paper and printing, as in the past. The Pictorial Review Company procured and deposited with the Irving Trust Company the written resignations of all of its present officers and directors and of the officers and directors of its subsidiaries. Such resignations were to become effective upon the acceptance thereof by the trustee and when directed by the third parties. The claimant agreed to immediately employ and retain a comptroller to be designated by the third parties, his salary to be paid by the claimant and he to be authorized and empowered to institute budgetary control and to take care of, supervise and rearrange the accounting system and to countersign checks and commercial paper. Claimant also agreed to employ whenever the

third parties should request, a general manager to be designated and named by them, his salary to be paid by the claimant and to vest him with such powers and duties as they might deem necessary and advisable in their own interests and in the interests of claimant and its subsidiaries and to adopt and put into effect such business policies as the comptroller and general manager might deem advisable.

It further agreed that neither it nor its subsidiaries would sell, lease or otherwise dispose of, or mortgage or pledge any of its accounts or bills receivable, or any of its assets, or borrow any money or make any long-term commitments or contracts without, in each instance, obtaining the written consent of the third parties; that neither it nor its subsidiaries would issue or sell any additional shares of stock nor declare any stock dividend nor declare or pay any cash dividend or amend its by-laws or buy any shares of its own stock or the stock of its subsidiaries or buy securities for investment without the consent of the third parties; also not to retain any employees who were unsatisfactory to them. Claimant and Ahnelt together agreed to cause the board of directors and stockholders to take any action required to carry out the terms of the contract including such amendments of by-laws as might be necessary whenever requested by the said third parties. Ahnelt individually agreed to devote his entire time and attention to the business of the claimant party and its subsidiaries.

The agreement also provided that dividends received upon shares of stock deposited with the trust company should be retained by it as additional security until the third parties directed in writing the distribution thereof which should then be applied in the reduction of the indebtedness secured by the agreement.

It is expressly stipulated that the trustee should not be liable for any action taken by it " as the holder or owner of said shares of stock when " such action had been directed by the parties of the third part. That the trustee would not assume any stockholders' liability in causing the shares to be transferred into its own name. The trustee was to be " entitled to receive from the party of the first part reasonable remuneration for all services performed by it in the discharge of its trust and reimbursement for expenses made and incurred."

The granting clause of the agreement read as follows: " *Fourteenth.* As security for the prompt and punctual performance and observance of each and every of the covenants, agreements and conditions of this agreement provided to be kept, performed or observed by the party of the first part, or any of its subsidiaries, or by the party of the second part, and as security for the payment

by the party of the first part of the present indebtedness owing by it and its subsidiaries to the parties of the third part and their respective subsidiaries, and the payment of the promissory notes hereby provided to be given by the party of the first part to evidence such indebtedness, and any renewals thereof, and the payment of any indebtedness which may be hereafter incurred by the party of the first part or any of its subsidiaries to either of the parties of the third part or their respective subsidiaries during the term of this agreement, the party of the second part has assigned, transferred and set over, and by these presents does hereby assign, transfer and set over unto the Irving Trust Company, as Trustee, and its successors and assigns, 155,960 shares of the capital stock of The Pictorial Review Company, and 19,250 shares of the capital stock of the Excella Pattern Company, Inc., in trust, nevertheless, for the equal and proportionate benefit, security and protection of the parties of the third part in the enforcement of this agreement and in the payment of the present indebtedness and any subsequent indebtedness now or hereafter owing to either of them or any of their respective subsidiaries by the party of the first part or any of its subsidiaries, subject, however, to the trusts, uses, purposes and powers hereinafter expressed, namely: (1) The said Trustee is hereby authorized empowered and directed to take possession of the above-mentioned shares of stock, and the certificates evidencing the same; to cause said shares of stock to be transferred on the books of the issuing corporations into the name of said Trustee, as trustee under this agreement; to hold said shares of stock during the term of this agreement unless previously disposed of in accordance with the provisions of this agreement; to vote said shares of stock at any meeting of stockholders; to vote said shares of stock at any election of directors; to vote said shares of stock upon any motion, resolution or question coming before the stockholders of whatsoever character, including the sale, leasing, mortgaging or pledging of the whole or part of the assets, issuing of bonds or debentures, refinancing, reorganizing, consolidating, increasing or changing the authorized capital stock or otherwise amending the certificate of incorporation, issuing and selling shares of stock whether preferred or common, discontinuing of the publishing of any magazine or other publication, liquidating wholly or partially, or dissolving; to appoint proxies and attorneys-in-fact to vote said shares of stock; to sell, assign and transfer said shares of stock; to waive any notice required to be given to the holder or owner of said shares; to take any action or exercise any right which the owner or holder of said shares is authorized by law to take or exercise; and generally to do any act or thing with respect to the business and affairs of the

issuing corporations or with respect to said shares of stock which it would be lawful for said Trustee to do were it the absolute owner of said shares; provided, however, the said Trustee shall exercise the foregoing powers only at the times and in the manners directed by the parties of the third part. * * *

"(14) At the termination of this agreement by its express terms, and in any event at the expiration of ten years from the date of this agreement, the said shares of stock, or so much thereof as shall not have been theretofore disposed of by said Trustee in accordance with the provisions hereof, shall revert to the party of the second part, and the interest of the said Trustee therein shall cease and terminate, and in such case the said Trustee shall, upon demand of the party of the second part and at his cost and expense, execute proper instruments discharging and releasing such property from this trust, and shall reassign, retransfer and redeliver the same to the party of the second part. The said Trustee shall not be obliged to make any such redelivery prior to ten years from the date hereof until it has been notified in writing by the parties of the third part that this agreement has been terminated."

The agreed statement of facts reads: " During the time the Irving Trust Company held the shares of stock, the said Irving Trust Company did not transfer the shares of stock on their books and did nothing but retain the stock until it was delivered to the original depositors."

If this transaction were a simple delivery over of certificates of stock indorsed in blank as collateral security for a present loan it would be exempt. If it were a simple delivery of certificates of stock indorsed in blank as collateral security for a past due indebtedness and for the extension of future credit it would, I believe, fall within the intent and scope of the exempting clause.

But the agreement evidences not only the delivery over and assignment of the certificates of shares of stock to secure a past due indebtedness and the extension of future credit but in addition the absolute parting with control of the affairs of the corporation even to the point of permitting the trustee to discontinue the publishing of any magazine or other publication and liquidating or dissolving the company. At any time that the two creditors, the third parties to the agreement, should direct the Irving Trust Company could step in and dispose of the board of directors, the officers and the employees, could direct the operations of the corporation in the minutest detail or dispose of it entirely. That it did not do so does not change the intent and meaning of the contract.

In this respect the case is clearly distinguishable from *Travis* v. *American Cities Co.* (192 App. Div. 16), which is relied upon by

claimant. There, MERRELL, J., said: " That within the provision of said law the stock certificates of the American Cities Company were not ' actually sold ' is plain from the provision of the trust mortgage conferring upon the pledgor itself the right to make future sales or contracts to sell said shares."

In the present case the pledgor could make no future sales and had no control over its own stock corporation. Again in the same opinion, MERRELL, J., said: " Under the indenture between the parties, it seems to me clear that there was no actual sale or intention to sell or transfer any beneficial interest in the shares in question to the trustee, and that the beneficial and equitable title to said shares at all times remained in the pledgor, subject, however, to the latter's being foreclosed of such title in case of default in performance of its agreement."

In the present case, the beneficial and equitable title was entirely in the hands of the Irving Trust Company as trustee under the agreement and for the benefit of the two creditors the third parties thereto.

We reach the conclusion that the transfer tax stamps were not erroneously affixed to the stock certificates, that the tax was properly paid and that the claim must be dismissed.

BARRETT, P. J., concurs.